UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| BRONSON SHELLEY #353229, )<br>)<br>Plaintiff, )<br>)<br>-vs- )<br>)<br>)<br>)<br>BRYAN P. STIRLING, J. MICHAEL )<br>BROWN, and DENNIS PATTERSON, )<br>)<br>Defendants. )<br>_____ ) | Civil Action No. 4:18-cv-2229-JD-TER<br><br><br><br>**REPORT AND RECOMMENDATION** |

## I.     INTRODUCTION

Plaintiff, who is proceeding pro se, brings this action pursuant to 42 U.S.C. § 1983, alleging violations of the First Amendment's Free Exercise Clause and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc et seq. Presently before the Court is Defendants' Motion for Summary Judgment (ECF No. 99). Because Plaintiff is proceeding pro se, he was advised pursuant to Roseboro v. Garrison, 528 F.3d 309 (4th Cir. 1975), that a failure to respond to Defendants' motion could result in dismissal of his Complaint. After requesting an extension of time, Plaintiff filed his Response (ECF No. 116). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), DSC. This report and recommendation is entered for review by the district judge.

## II.     PROCEDURAL HISTORY

Plaintiff initiated this action seeking both a preliminary and permanent injunction mandating that SCDC recognize "Hebrew Israelite" as a religion and afford him a series of accommodations.

He also sought damages in the amount of $1,000,000 against Defendants in both their individual and official capacities.

Defendants moved to dismiss the case on the grounds that Defendants could not be held liable in their official capacities, that Plaintiff had failed to exhaust his administrative remedies, and that Plaintiff had failed to state a claim. The undersigned entered a Report and Recommendation recommending that Defendants could not be held liable for damages in their official capacities, Plaintiff had not met the requirements for a preliminary injunction, dismissal was not appropriate for failure to exhaust administrative remedies, and that Plaintiff had sufficiently stated a cause of action.

The Report and Recommendation was adopted in part by the District Judge, who dismissed Plaintiff's claims for damages against Defendants in their official capacities and dismissed Plaintiff's claims for injunctive relief as moot because of his release from SCDC custody. Only the claims for damages against Defendants in their individual capacities survived. On June 24, 2020, Plaintiff filed a motion for relief from said order, asserting that he was committed back to the custody of the SCDC on December 19, 2019, and therefore his claims for injunctive relief are no longer moot. On August 21, 2020, Plaintiff filed a new lawsuit, asserting the same claims as those herein, but adding an additional defendant and a claim for injunctive relief. Because Plaintiff can pursue injunctive relief in the new action, it is recommended that the Motion for Relief from Judgment of Order (ECF No. 106) be denied.

## III.   FACTS

On May 16, 2013, Plaintiff first requested official recognition of the "Hebrew Yisraelite" faith group. ECF No. 70-2, p. 1; ECF No. 65-3, ¶ 7. J. Michael Brown, then Senior Chaplain at

Broad River Correctional Institution, discussed this faith with Plaintiff and Plaintiff provided him some materials from "The New Covenant Congregation of Israel" located in Decatur, Georgia. ECF No. 70-2, p. 3. Brown was of the opinion that the materials submitted by Plaintiff and on the church's website included racially prejudicial and inflammatory positions which Brown believed was in conflict with SCDC Policy 10.05, "Inmate Religion," which states in section 5 that "[a]ny religious group that claims a racial bias will not be approved group practice" and that "[r]eligious literature that includes writing or pictures that are racially inflammatory or support a belief in racial superiority will not be allowed." ECF No. 65-3, ¶ 8; ECF No. 65-2; ECF No. 70-2, p. 3. Brown presented Plaintiff's request and attendant materials to his immediate supervisor at that time, Associate Warden Sharonda Sutton, and received an initial disapproval of this requested recognition. ECF No. 65-3, ¶ 8; ECF No. 70-2, p.3. Brown also shared Plaintiff's request with Chaplain Lloyd Roberts, the then Chief of Pastoral Services. ECF No. 65-3, ¶ 8. In dialogue, Roberts concurred with the disapproval based on Policy limitations, and Brown communicated the disapproval to Plaintiff personally, face to face. ECF No. 65-3, ¶ 8; ECF No. 70-2, pp. 1-4.

On May 31, 2013, Plaintiff submitted a Request to Staff Member Form indicating that he wanted to appeal the decision denying recognition of the Hebrew Israelite faith. ECF No. 70-2, p. 5. It is not clear from the record presented what became of this request to appeal, other than another Request to Staff Member Form from Plaintiff dated February 1, 2015, in which Plaintiff asks for the response to his "faith recognition process last stage of appeal to the Head Chaplin. I was told the Head Chaplin at Headquarters retired and that I had to wait for a new one to be appointed before a decision was rendered." ECF No. 70-2, p. 7. Plaintiff received a response from Bennie Coldough,

Branch Chief of Chaplaincy, which appears[1] to state that he had no knowledge of Plaintiff's appeal and that Plaintiff should file a new request. ECF No. 70-2, p. 7.

On March 13, 2016, Plaintiff submitted a Request to Staff Member Form requesting recognition of the Hebrew Israelite faith. ECF No. 70-2, p. 23. On July 5, 2016, he completed an Inmate Request for Religious Assistance Fact Sheet and attached materials in support of his faith recognition request. ECF No. 70-2, pp. 25-36. Plaintiff requested status updates on his request for faith recognition of the Hebrew Israelite faith group on August 18, 2016, December 21, 2016, March 31, 2017, and September 17, 2017. After each request, Plaintiff received a response that no decision had yet been made. ECF No. 1 and 1-1, pp. 1-6. On August 28, 2017, Plaintiff received a memorandum from Sherman L. Anderson, Chief of the Office of General Counsel–Inmate Grievance Branch. ECF No. 1 and 1-1, pp. 4-5. Anderson informed Plaintiff that SCDC's General Counsel Office was reviewing his request for the Hebrew Israelites to be a recognized faith group, but that there are approximately 23,000 inmates housed at SCDC, and his office "may receive at least one request per month for a religion to be recognized." ECF No. 1 and 1-1, pp. 4-5. Anderson also informed Plaintiff that

> there are restrictions on religious types that SCDC will recognize. Any religious group that claims a racial bias will not be allowed group practice; religious literature that includes writing or pictures that are inflammatory or support a belief in racial superiority will not be allowed; any practice that requires dangerous objects that could be used as potential weapons, such as a knife for animal sacrifice, will not be allowed; any practice that includes the use of illegal drugs such as marijuana or peyote will not be allowed.

ECF No. 1-1, p. 5.

---

[1] Part of the form appears to have been covered during photocopying such that some words are not visible.

On October 2, 2017, Plaintiff filed a Step 1 grievance stating that he had been subject to discrimination and arbitrary denial of the ability to practice his faith. ECF No. 1 and 1-1, p. 7. In the "Action Requested" section, Plaintiff requested "that my faith group 'Hebrew Israelites' be recognized as a bona fide religion here within SCDC, allowed a kosher diet and vegan diet of our choice since some Hebrews eat kosher or vegan diets and that we be allowed to grow our hair in locks, braids, or afro-styles and grow our beards long with no limitations on hair length, etc." ECF No. 1-1, p. 7. His grievance was returned by Chaplin Hendricks for Plaintiff's failure to await a response from the SCDC legal department on his faith recognition request. ECF No. 70-2, p. 48. On November 8, 2017, Plaintiff submitted a Request to Staff Member Form to "appeal" the return of his grievance, asserting that he had been awaiting a response to his faith recognition request for over two years. ECF No. 1 and 1-1, p. 8. The form was returned with instructions for Plaintiff to contact the local Inmate Grievance Coordinator for assistance in filing his grievance and a notation that the issue of his faith recognition request had already been addressed in a grievance. ECF No. 1-1, p. 9.

On May 14, 2018, Plaintiff filed another Step 1 grievance regarding the failure to provide him with a decision on his request for recognition of the Hebrew Israelite faith group. ECF No. 1-1, p. 10.

On August 13, 2018, Plaintiff filed the present action. On August 29, 2018, J. Michael Brown, Chief of Pastoral Care Services at SCDC, after obtaining input from SCDC legal counsel and SCDC police services, made the decision to deny Plaintiff's request for recognition of Hebrew Israelites as a faith. Brown avers that when he was promoted to serve as Chief of Pastoral Services, he was presented with the renewed recognition request for the Hebrew Israelite faith from Plaintiff.

ECF No. 65-3, ¶ 9. Brown turned over the request and attendant materials to SCDC's Office of General Counsel. ECF No. 65-3, ¶ 9. Someone within that office contacted Dennis Patterson, Assistant Deputy Director for Operations at SCDC, regarding Plaintiff's request and asked him whether official recognition of the Hebrew Israelites could pose a security issue.[2] ECF No. 99-3, ¶ 6. Brown eventually received a response from Annie Rumler in the Office of General Counsel in August of 2018, indicating that a disapproval response was validated. ECF No. 65-3, ¶ 9. Brown communicated this determination to the SCDC Chaplains. ECF No. 65-3, ¶ 9. Chaplin Epps of Perry Correctional Institution where Plaintiff was then located was to notify Plaintiff directly of the decision. ECF No. 65-3, ¶ 9. Plaintiff's release from SCDC on September 7, 2018, prevented Epps from directly notifying Plaintiff of this decision. ECF No. 65-3, ¶ 9.

### IV. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574

---

[2]Patterson avers that one of his responsibilities in his role as the Assistant Deputy Director for Operations is to assess potential security risks within the prison populations. ECF No. 99-3, ¶ 5.

(1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

**V.     DISCUSSION**

    **A.     RLUIPA**

The RLUIPA provides that no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution unless the government demonstrates that imposition of the burden on that person 1) is in furtherance of a compelling governmental interest,

and 2) is the least restrictive means of furthering that compelling governmental interest. See 2 U.S.C. § 2000cc–1(a); Cutter v. Wilkinson, 544 U.S. 709, 712, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). Congress has not authorized monetary damages against state officials (in either official or individual capacity) under RLUIPA. Sossamon v. Texas, 131 S.Ct. 1651, 1658–59 (2011). The Fourth Circuit Court of Appeals has instructed that "[d]amages are not recoverable on [a RLUIPA] claim because ... a state's Eleventh Amendment immunity from suit for damages is not waived in RLUIPA." Lovelace v. Lee, 472 F.3d 174, 193-94 (4th Cir. 2006); see also Madison v. Virginia, 474 F.3d 118, 132 (4th Cir. 2006); Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009). Further, as discussed above, Plaintiff's claim for injunctive relief has been dismissed. Because RLUIPA provides no remedy for Plaintiff in this action, summary judgment is appropriate as to Plaintiff's RLUPIA cause of action.

### B.     Free Exercise Clause

Plaintiff's claim that Defendants violated his rights under the Free Exercise Clause falls within 42 U.S.C. § 1983. Section 1983 " 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). A legal action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999). To be successful on a claim under § 1983, a plaintiff must establish two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. West v. Atkins, 487 U.S.

42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). The parties do not dispute that Defendants were acting under color of state law. However, Defendants argue that Plaintiff fails to present sufficient facts to show that they violated a right secured by the United States Constitution.

Specifically, Defendants argue that they are entitled to qualified immunity. Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." Meyers v. Baltimore County, 713 F.3d 723, 731 (4th Cir. 2013). "Not all constitutional violations are violations of clearly established ... constitutional rights, so a plaintiff may prove that an official has violated his rights, but an official may still be entitled to qualified immunity." Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst, 810 F.3d 892, 907 (4th Cir. 2016) (citing Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991) (internal citations and quotations omitted)). Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). When evaluating a qualified immunity defense, the court must determine (1) whether the facts presented, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 230-33 (2009).

Under the First Amendment, inmates clearly retain the right to free exercise of religion in prison. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). The Free Exercise Clause of the First Amendment prohibits the adoption of laws designed to suppress religious beliefs or practices. See Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir.2001). To state an actionable violation under the Free Exercise Clause, a plaintiff must show both that he has a sincerely held a religious belief

and that the defendant's actions substantially burdened his religious freedom or expression. See Blue v. Jabe, 996 F.Supp. 499, 502 (E.D.Va.1996) (discussing Wisconsin v. Yoder, 406 U.S. 205, 215–216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)). The Supreme Court has defined "substantial burden" in a variety of ways, including "putting substantial pressure on an adherent to modify his behavior and violate his beliefs," Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 717–18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), and forcing an individual to "choose between following the precepts of [his] religion and forfeiting benefit, on the one hand, and abandoning one of the precepts of [his] religion ... on the other," Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

However, state action only violates a prisoner's constitutional rights if it burdens the prisoner's religious rights and is not reasonably related to a legitimate penological interest. See Turner v. Safley, 482 U.S. 78, 89 (1987). "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." O'lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). With respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. See Cruz v. Beto, 405 U.S. 319, 322 (1972). That retained right is not unfettered. Prison restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution. See Turner, 482 U.S. at 89-91. In deciding whether a defendant's actions can be sustained as reasonably related to legitimate penological interests, the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in

question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist that accommodate the right and satisfy the penological interest. Turner, 482 U.S. at 89-90 (citations omitted). When applying these factors, the court must "respect the determinations of prison officials." United States v. Stotts, 925 F.2d 83, 86 (4th Cir.1991). Even so, "[i]mplicit in the Turner approach is the principle that the four-factor analysis applies only after it is determined that the policy impinges on a First Amendment right." Ali v. Dixon, 912 F.2d 86, 89 (4th Cir. 1990).

Defendants here do not dispute that Plaintiff has a sincerely held religious belief in the Hebrew Israelite religion. However, they argue that their actions did not substantially burden his religious freedom or expression. Defendants argue that even though they denied Plaintiff's request for official recognition of the Hebrew Israelite religion, SCDC still accommodates the exercise of Plaintiff's religious practices by allowing him to practice his faith privately and giving him the option to choose the alternative diet for religious preference. ECF No. 65-3, ¶ 9.

Plaintiff argues that being allowed to practice his faith privately does not alleviate the substantial burden on the practice of his religion because he is still subject to the grooming policy, is not allowed to congregate with others or celebrate high holy days, and is not allowed to wear his turban, fringed shirt and star of david medallion. He also argues that the alternative diet offered by SCDC is neither kosher nor vegan and thus does not accommodate his religious beliefs. Courts have recognized the issues raised by Plaintiff to be substantial burdens on the exercise of religion.

The Supreme Court has recognized that "exercise of religion" involves "assembling with others for a worship service," Cutter v. Wilkinson, 544 U.S. 709, 720, 125 S.Ct. 2113 (2005), and

"refusal to allow group worship clearly places a substantial burden on [an inmate's] free exercise," Coward v. Robinson, 276 F. Supp. 3d 544, 568 (E.D. Va. 2017).  Further, the Fourth Circuit has held that a grooming policy requiring inmates to cut their hair compels them to modify their behavior in violation of genuinely held religious beliefs and, thus, substantially burdens the inmate's religious exercise.  Smith v. Ozmint, 578 F.3d 246, 251–52 (4th Cir. 2009).  Also, inmates are entitled to a diet in conformity with their religious beliefs under the Free Exercise Clause.  Lovelace v. Lee, 472 F.3d 174, 198-99 (4th Cir. 2006).

Nevertheless, as discussed above, a prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is rationally related to furtherance of a legitimate governmental or penal interest. O'Lone, 482 U.S. at 349; Turner, 482 U.S. at 89–91.  In deciding whether a defendant's actions can be sustained as reasonably related to legitimate penological interests, the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist that accommodate the right and satisfy the penological interest. Turner, 482 U.S. at 89-90 (citations omitted).

The evidence in the record regarding why Plaintiff's beliefs have been substantially burdened is that Defendants were following SCDC Policy 10.05, "Inmate Religion," which states in section 5 that "[a]ny religious group that claims a racial bias will not be approved group practice" and that "[r]eligious literature that includes writing or pictures that are racially inflammatory or support a

belief in racial superiority will not be allowed." ECF No. 65-3, ¶ 8; ECF No. 65-2; ECF No. 70-2, p. 3.  Brown avers that he was of the opinion that the materials Plaintiff provided regarding the Hebrew Israelite Faith included racially prejudicial and inflammatory positions that violated SCDC Policy 10.05, though he does not point to specific evidence of the racially prejudicial and inflammatory positions.  ECF No. 65-3, ¶ 8.  Brown further consulted with Patterson, Assistant Deputy Director for Operations at SCDC, to determine whether recognition of the Hebrew Israelite faith could pose a security threat.  Patterson avers that he reviewed the information provided to him regarding the teachings of the group and learned that the group was designated a "hate group" by the Southern Poverty Law Center.  ECF No. 99-3, ¶ 7. Based on this research, Patterson avers that he reached the opinion that, because of its racist teachings, officially recognizing Hebrew Israelites as a religious group within SCDC would generate racial animus among prisoners and pose a security issue to both staff and other inmates.  ECF No. 99-3, ¶ 8.

When applying the Turner factors to the evidence presented in this case, issues of fact exist as to whether Defendants have violated Plaintiff's constitutional right to the free exercise of his religion.  First, "internal [prison] security [is] perhaps the most legitimate of penological goals." Overton v. Bazzetta, 539 U.S. 126, 133 (2003).  However, based on the evidence presented, an issue of fact exists as to whether the Hebrew Israelite religion contains racially prejudicial and inflammatory views and teachings, which is the reason for the security concerns.  Defendants state generally that the religion promotes such views but does not point to specific examples of racist teachings.  Plaintiff points to one of the documents he submitted with his request for recognition of

the Hebrew Israelite faith, Key Points in the Theology of NCCI[3], which states that "we believe through the obedience of the law and the prophets that all mankind will receive salvation, to the Jew first then to the rest of the nations who become spiritual jews." ECF No. 116-1 p. 29. He argues the belief that all mankind can receive salvation contradicts Defendants' belief that the religion promotes racist teachings. Defendant Patterson also states generally, without any evidentiary support, that the Hebrew Israelites are designated by the Southern Poverty Law Center as a hate group. However, Plaintiff has produced the Southern Poverty Law Center's list of "2018 black nationalist hate groups," which includes neither Hebrew Israelites nor the New Covenant Congregation of Israel on the list. ECF No. 116-1, pp. 54-57.[4]

The next consideration under Turner is whether there are alternative means of exercising the right in question that remain open to prisoners. Defendants argue that SCDC accommodates Plaintiff's religion even without officially listing it as a recognized religion by allowing Plaintiff to practice the religion privately and allowing him to choose the alternative diet that SCDC provides for religious purposes. However, Plaintiff argues that communal worship is an integral part of his religion and, thus, practicing the religion privately does not alleviate the substantial burden created by Defendants' decision not to recognize his religion. Pl. Decl. ¶ 3 (ECF No. 116-3, p. 20). He

---

[3]NCCI stands for New Covenant Congregation of Israel, the Hebrew Israelite sect to which Plaintiff belongs.

[4]Further, the undersigned notes that numerous corrections facilities outside of South Carolina include Hebrew Israelites as a recognized religion. See, e.g., Siddha v. Dovey, No. CV GLR-20-185, 2020 WL 6204317, at *3 (D. Md. Oct. 22, 2020) (listing Hebrew Israelites as one of the recognized religions by Maryland corrections facilities); Covington v. Perry, No. 5:15-CT-3177-FL, 2018 WL 4964360, at *2 (E.D.N.C. Oct. 15, 2018) (including Hebrew Israelites as a recognized religion in North Carolina corrections facilities); Coward v. Robinson, 276 F. Supp. 3d 544, 562 (E.D. Va. 2017) (acknowledging Hebrew Israelites as a religion approved by the Virginia Department of Corrections).

further asserts that Defendants' decision prevents him from practicing privately anyway because he is not allowed "religious accouterments" or Hebrew Israelite literature for personal use. See ECF No. 116-3, p. 17; Pl. Decl. ¶ 4 (ECF No. 116-3, p. 21).

The third and fourth factors under Turner are the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources and whether ready alternatives exist that accommodate the right and satisfy the penological interest. However, there is insufficient evidence in the record regarding the factors to allow the undersigned to consider them.

As set forth above, Plaintiff has shown that Defendants' decision not to recognize the Hebrew Israelite faith places a substantial burden on his right to freely exercise his religion. Based on the record presented, issues of fact exist as to whether this burden is reasonably related to legitimate penological interests such that no constitutional violation of the First Amendment has occurred.

However, there is no evidence in the record that Defendant Stirling had any involvement in the decision not to recognize the Hebrew Israelites as a religion within SCDC. Supervisory liability under § 1983 may not be predicated only on the theory of respondeat superior. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 663 n.7 (1978). In a § 1983 action, Plaintiff must allege that an individual personally acted in the alleged violations. There is a limited exception to the prohibition as long as the facts alleged meet the Fourth Circuit Court of Appeal's three-part test for supervisor liability under § 1983: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive

practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)(citations omitted); Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). The evidence in the record does not indicate any actual personal involvement by Stirling in a claim of a constitutional magnitude or any fact sufficient to meet the supervisory liability exception. Therefore, summary judgment is appropriate as to Plaintiff's claims against Stirling.

As to Defendants Brown and Patterson, they argue that even if they did violate Plaintiff's constitutional right under the First Amendment, they are still entitled to qualified immunity because the rights Plaintiff alleges were violated were not clearly established at the time of the alleged misconduct. The Supreme Court has articulated that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Short of that, however, "if a reasonable officer might not have known for certain that the conduct was unlawful – then the officer is immune from liability." Ziglar v. Abbasi, -- U.S. --, 137 S.Ct. 1843, 1867 (2017). The doctrine of qualified immunity gives officials "breathing room to make reasonable but mistaken judgments about open legal questions." Ziglar v. Abbasi, 137 S.Ct. 1843, 1866 (2017) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 743 (2011)).

"To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." Reichle v. Howards, 566 U.S.

658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) (alteration in original) (citation and internal quotation marks omitted). While "[w]e do not require a case directly on point, ... existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074; see Crouse v. Town of Moncks Corner, 848 F.3d 576, 583 (4th Cir. 2017). Here, Defendants Brown and Patterson made their decision not to include Hebrew Israelites as a recognized religion within SCDC based upon SCDC Policy 10.05, section 5, which states that "[a]ny religious group that claims a racial bias will not be approved group practice" and that "[r]eligious literature that includes writing or pictures that are racially inflammatory or support a belief in racial superiority will not be allowed." ECF No. 65-2; ECF No. 70-2, p. 3. It is clearly established that prison officials may not substantially burden an inmate's practice of his religion absent a reasonable relationship to legitimate penological interests. Turner, 482 U.S. at 89. As discussed above, an issue of fact exists as to whether the decision not to recognize Hebrew Israelites within SCDC was reasonably related to legitimate penological interests. "Disputed facts are treated no differently in this portion of the qualified immunity analysis than in any other context." Vathekan v. Prince George's Cty., 154 F.3d 173, 180 (4th Cir. 1998) (quoting Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir.1995)). This dispute of material fact is sufficient to preclude summary judgment on qualified immunity grounds. See Gamble v. S.C. Dep't of Corr., No. 2:19-CV-2242-DCN-MGB, 2020 WL 5249223, at *8 (D.S.C. Sept. 3, 2020) (denying summary judgment on qualified immunity grounds because issues of fact exist).

Therefore, for the reasons discussed above, summary judgment is not appropriate as to

Plaintiff's Free Exercise claims against Defendants Brown and Patterson.[5]

## VI. CONCLUSION

For the reasons discussed above, it is recommended that Defendants' Motion for Summary Judgment (ECF No. 99) be granted as to Plaintiff's claim under RLUIPA and as to all claims against Defendant Stirling, and that it be denied as to Plaintiff's Free Exercise claims against Defendants Brown and Patterson. It is further recommended that Plaintiff's Motion for Relief from Judgment of Order (ECF No. 106) be denied.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 28, 2021
Florence, South Carolina

**The parties are directed to the important information on the following page.**

---

[5] In his Response, Plaintiff also argues that Defendants violated the Establishment Clause and the South Carolina Religious Freedom Act, S.C Code Ann. § 1-32-10, et al. However, he did not raise these claims in his Amended Complaint. It is well settled that a party is not permitted to raise a new claim in response to a motion for summary judgment. Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008) (citation omitted); White v. Roche Biomedical Labs., Inc., 807 F. Supp. 1212, 1216 (D.S.C. 1992) (citations omitted).